**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **Walgreen Co.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. |
| v. ) | |
| ) | **JURY DEMANDED** |
| ) | |
| **Fitbit, Inc.,** ) | |
| ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Walgreen Co. ("Walgreens"), by and through its undersigned attorneys, hereby files this Complaint for breach of contract against Fitbit, Inc. ("Fitbit"), alleging as follows:

### I.    NATURE OF THE CASE

1.    This is an action for breach of contract or, alternatively, unjust enrichment. It arises from Fitbit's breach of its promises and obligations pursuant to the parties' contracts and agreements. Specifically, Fitbit sold personal fitness and body tracking electronic products (the "Tracker Products") to Walgreens on a guaranteed-sale basis. Fitbit specifically agreed to: (1) refund Walgreens to the extent that the Tracker Products did not meet agreed-to benchmarks and unsold units of Tracker Products were ultimately returned to Fitbit; (2) repay Walgreens for units of Tracker Products that, consistent with the applicable written policies and contracts, were deemed unsaleable; and (3) pay Walgreens to participate in various promotions. In this regard, Fitbit has failed to live up to its agreements with Walgreens.

2.    As a direct and proximate result of Fitbit's breaches of contract, Walgreens has suffered damages in an amount to be proven at trial, but not less than $140,116.14. This amount

accounts for offsets that Walgreens has applied to Fitbit's account with Walgreens, as the parties agreed that Walgreens could do. Walgreens files this lawsuit to recover those damages.

## II.  THE PARTIES

3.  Walgreens is an Illinois corporation with its principal place of business at 200 Wilmot Road, Deerfield, Illinois, 60015. Walgreens is in the business of providing consumer goods and services, as well as pharmacy, health and wellness services, through thousands of retail drugstores throughout the United States.

4.  Fitbit, Inc. is an active Delaware for-profit corporation engaged primarily in the development, production and distribution of personal fitness and body tracking electronic products, services and applications. Fitbit's principal place of business is located at 199 Fremont Street, 14th Floor, San Francisco, California 94105.

## III.  JURISDICTION AND VENUE

5.  This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because the citizenship of Walgreens and Fitbit is diverse and the amount in controversy is in excess of $75,000.

6.  Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims made in this lawsuit occurred within the Northern District of Illinois. Moreover, in the written agreement between them (discussed further below), the parties "consent[ed] to the exclusive jurisdiction of the courts of the State of Illinois or Federal District Court of the Northern District of Illinois and agree[d] to waive all objections as to venue and forum non conveniens."

## IV.     FACTUAL ALLEGATIONS

### A.     The Parties' Agreements

7. In 2012, Walgreens and Fitbit agreed that Walgreens would buy Tracker Products from Fitbit and stock Tracker Products at its stores for resale to consumers. Walgreens and Fitbit agreed that these purchases by Walgreens would be pursuant to certain written agreements.

8. The written agreement through which all purchases by Walgreens from Fitbit were made was the Walgreen Co. General Trade and Electronic Data Interchange Agreement (the "GTA"). Fitbit, through its authorized representative Mark Silverio, signed the GTA with an effective date of February 1, 2012.

9. The GTA stated in its preamble that: "The terms and conditions contained herein shall apply to all merchandise . . . sold by Vendor [Fitbit], directly or indirectly through its distributors, to Walgreen[s]."

10. The GTA further provided that: "[Fitbit]'s performance shall be in accordance with these terms, dating and conditions. Any other terms in [Fitbit]'s acceptance are rejected unless agreed to in writing and signed by Walgreen's authorized representative." Further clarifying that the GTA controlled the parties' relationship, it provided that: "In the event of a conflict between these terms or any purchase order issued by Walgreen[s], and any document issued by [Fitbit], the terms of this Agreement shall control." The GTA further provided that: "No oral modification or waiver of any of the provisions of this Agreement shall be binding on either party."

11. The parties never signed any written modification of the GTA that contradicted or modified any of its terms.

3

12. The GTA states that "if a purchase order is designated as a 'Guaranteed Sale,' . . . Walgreen[s] shall not be obligated to pay for any merchandise until after it is sold by Walgreen[s] in accordance with terms agreed upon by the parties."

13. All purchases by Walgreens from Fitbit were on a "Guaranteed Sale" basis. Thus, consistent with the GTA, Walgreens was not obligated to pay for the merchandise until it was sold pursuant to agreed-upon terms. Moreover, by the terms of the GTA, if Walgreens' sales expectations were not met, Walgreens had a right to return the merchandise to Fitbit (with no payment obligation having arisen), which would provide a corresponding refund to Walgreens for the Tracker Products and costs incurred by Walgreens when it returned the unsold units of Tracker Products to Fitbit, including the agreed-to upcharge fee and applicable freight expenses.

14. The GTA further states that " . . . Walgreen[s] shall have the unrestricted right to rescind its purchase of the merchandise from [Fitbit] both before and after acceptance of such merchandise by Walgreen[s]."

15. The GTA states that "[i]n the event that Walgreen[s] is entitled to credits, offsets or charge backs (collectively, 'Credits') with respect to any transaction, Walgreen[s] may take such Credits against any amounts otherwise due to [Fitbit] arising from or under any transaction between [Fitbit] and Walgreen[s] . . ."

16. Additionally, the GTA states "[Fitbit] is subject to all policies, procedures, terms and conditions as posted on Walgreen's SupplierNet website located at https://vendor.walgreens.com and all such policies, terms and conditions, as updated from time to time, are hereby incorporated herein and made a part hereof."

17. One policy listed on SupplierNet, and incorporated into the GTA, is the Unsaleables Policy. The Unsaleables Policy provides that Walgreens "requires its vendors to

bear the risk of merchandise in Walgreens' possession that is deemed by Walgreens, in its sole discretion, to be unsaleable." Unsaleable goods include outdated or defective goods along with goods returned by customers. For goods that are deemed "unsaleable," "unless otherwise agreed," the "merchandise is reported to the District Manager and then disposed of." These unsaleable claims are then "charged against [Fitbit] on a monthly basis."

### B. Fitbit Breaches its Agreements with Walgreens

18. Walgreens ordered Tracker Products from Fitbit at prices ranging from $16 to $106 per unit, paid for the items and placed them for sale in its stores. However, the units of Tracker Products did not all sell and some units were returned or never delivered to Walgreens.

19. Consistent with the terms of the GTA, Walgreens returned at least 3,616 units of Tracker Products to Fitbit between August 2018 and March 2019. Each unit of Tracker Products that Walgreens returned to Fitbit was authorized by the parties' agreements either because the Tracker Product did not meet agreed-to benchmarks or because it was sold to Walgreens on a guaranteed sale basis. Fitbit accepted those returned items, for which Walgreens had paid Fitbit approximately $160,561.64.

20. Walgreens incurred costs when it returned unsold Tracker Products to Fitbit. Consistent with Walgreens' right to rescind in the GTA, Fitbit is responsible to Walgreens for those costs, including the agreed-to upcharge fee, which in this case totals approximately $8,331.71, plus freight expenses, totaling approximately $565.40.

21. As a result of the returns referenced in Paragraphs 19 and 20 above, Fitbit now owes Walgreens at least $169,458.75 for the units of Tracker Products that Walgreens returned to Fitbit. Walgreens demanded this payment from Fitbit, but in breach of the parties' agreements, Fitbit has refused to pay this amount.

22. Consistent with the terms of the GTA, Walgreens also destroyed 41 units of unsaleable Tracker Products for which it had paid Fitbit approximately $1,603.76. Consistent with the terms of the parties' agreements, Walgreens demanded this payment from Fitbit. In breach of the parties' agreements, however, Fitbit has refused to pay this amount.

23. Consistent with the terms of the GTA, Fitbit agreed with Walgreens to participate in various promotions throughout the parties' business relationship. The amount that Fitbit owes to Walgreens for Fitbit's participation in these promotions is $6,984.91. Consistent with the parties' written agreements, Walgreens demanded this payment from Fitbit. In breach of the parties' agreements, however, Fitbit has refused to pay this amount.

24. In total, Fitbit owes Walgreens $178,047.42 arising from its breaches of its agreements with Walgreens. However, as provided for in the GTA, Walgreens has taken credits against Fitbit's account with Walgreens to mitigate its damages, reducing the current amount that Fitbit owes to Walgreens to $140,116.14.

## V. CAUSES OF ACTION

### COUNT I: BREACH OF CONTRACT

25. Walgreens re-alleges as Paragraph 25 of Count I paragraphs 1-24 above.

26. Walgreens and Fitbit contracted for Walgreens to buy Tracker Products from Fitbit on a "Guaranteed Sale" basis. Walgreens agreed to and did pay prices ranging from $16 to $106 per unit of Tracker Product.

27. Walgreens and Fitbit also contracted that any unsold units of Tracker Products could and would be returned to Fitbit. Fitbit agreed to refund Walgreens the amounts Walgreens had paid for those units of Tracker Products, and that Fitbit would be responsible for paying freight costs and an upcharge fee for all returned units of Tracker Products.

28. Walgreens and Fitbit contracted by the GTA that Walgreens would be refunded for the amounts Walgreens paid for any goods deemed unsaleable by Walgreens, in its sole discretion.

29. Walgreens and Fitbit also contracted that Fitbit would participate in various marketing promotions and would reimburse Walgreens for the associated costs.

30. The GTA, including its incorporated policies, as well as the agreements for Fitbit to participate in the marketing programs identified herein are valid and enforceable contracts.

31. Walgreens fully complied with its obligations pursuant to these contracts.

32. Fitbit, however, breached the terms of the parties' agreements, including by:

   a. Accepting the return of unsold Tracker Products, but refusing to refund the amounts already paid by Walgreens and refusing to reimburse for the incurred freight costs and related administrative fees;

   b. Failing to refund Walgreens for the 41 units of unsaleable Tracker Products; and

   c. Failing to reimburse Walgreens for its participation in various marketing promotions.

33. Fitbit's breaches proximately caused Walgreens' damages, in the amount of $178,047.42, of which Fitbit owes Walgreens at least $140,116.14, after accounting for credits taken by Walgreens pursuant to the GTA.

**WHEREFORE**, Walgreens prays that judgment be entered in its favor and against Fitbit for damages in an amount to be determined by the Court, but not less than $140,116.14, plus pre-judgment interest, and for such other relief as the Court deems just and proper.

7

## COUNT II: UNJUST ENTRICHMENT, PLED IN THE ALTERNATIVE

34. Walgreens re-alleges as Paragraph 34 of Count II the foregoing allegations, except those relating to its breach-of-contract claim, as if fully set forth herein.

35. By accepting return of the approximately 3,616 units of Tracker Products from Walgreens, but refusing to refund amounts already paid by Walgreens for those goods, and benefitting by the cost to Walgreens incurred making those returns, Fitbit has unjustly received a benefit from Walgreens.

36. Fitbit's benefit was received to Walgreens' detriment, as Walgreens paid for the units of Tracker Products that Fitbit now has and may re-sell. Additionally, Walgreens incurred the costs associated with returning those units of Tracker Products to Fitbit.

37. Fitbit was further unjustly enriched by Walgreens' payment for the 41 units of Tracker Products that were ultimately unsaleable.

38. Fitbit was unjustly enriched by its participation in various marketing promotions, the costs of which Fitbit has refused to reimburse Walgreens.

39. Allowing Fitbit to retain the benefits of its own wrongdoing, as alleged herein, would violate fundamental principles of justice, equity and good conscience, including by affording Fitbit the opportunity to sell the returned items twice.

**WHEREFORE,** Walgreens hereby requests that this Court enter Judgment in its favor and against Fitbit, awarding damages in an amount to be determined by the Court, but not less than $140,116.14, plus pre-judgment interest, and such other relief as the Court deems just and proper.

### VI. JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Walgreen Co. hereby demands trial by jury in this case.

Respectfully submitted,

**WALGREEN CO.**

By:     s/ Robert M. Andalman
         One of its Attorneys

Robert M. Andalman (ARDC #6209454)
Rachael Blackburn (ARDC #6277142)
Kristin Opal (ARDC #6327394)
A&G Law LLC
542 S. Dearborn St., 10th Floor
Chicago, IL 60605
(312) 341-3900
randalman@aandglaw.com
rblackburn@aandglaw.com
kopal@aandglaw.com

9